Hear ye, hear ye, hear ye. The United States Court of Appeals for the 11th Circuit is now open according to law. God save the United States and this honorable court. Thank you. I hope that everyone else is as excited as I obviously am to get started today. Good morning. Welcome to the 11th Circuit. We appreciate having you here virtually, although I know we all look forward to the time when we're back in person. Judge Marcus and I are again pleased to thank you again, Judge Jackson, for using all of your time and talents to help us with these important cases. So with that, let's get started on our first of two cases for today. We've got United States of America v. Perry. And Ms. Hogue, I believe that you are the first one up representing Mr. Perry. And you'll get your reserves. Judge Grant, pardon the interruption, but I just got notified that the stream has stopped. So could we stand by just for a moment? Yes, let's please stand by. Thank you. Okay, thank you, Judge. Apologies, counsel. Okay, Judge Grant, we are back up and running. Okay, great. Thank you. I'm not sure what is anything streamed. So I'll say again, please welcome to the 11th Circuit. We'll start our first case, United States v. Perry. Ms. Hogue, I have one and a half minutes for rebuttal, so please keep track of your own time. That's great. Wonderful. Thank you. You may start when you're ready. May it please the court, on September 23rd, 2014, Eddie Lee Perry was arrested in connection with this case and has since been released in 2020. Six years later, we are here to assess the validity of each of the allegations of error that we've raised in the final disposition ordering a judgment of 240 months, 20 years, of imprisonment involving one count of conspiracy with possession to intent, possession with intent to distribute crack and powder cocaine, and 13 counts of a use of a communication facility to facilitate that conspiracy. So we ask that you assess the validity of each of the allegations of error and then examine those errors in the aggregate to answer the question whether Eddie Lee Perry received a fundamentally fair trial. I suggest to the court, by your own recent holding last month in USC Hawkins, the answer, almost verbatim, is no. When Agent Lee acted as both lead case agent and, quote, expert in coded drug language, methods of trafficking drugs, and the manufacture of crack to powder, his testimony went beyond interpreting drug code words to interpreting conversations and agents' belief as to what was going on, who was speaking, who was moving, who was dealing, based almost exclusively on the case agent's knowledge and investigation in the case. The agent's improper opinion testimony cloaked with that authority of expert permeated the trial and painted the process requiring reversal. Speaking only for myself, sorry, this is Judge Grant. Speaking only for myself, I will say I think it's certainly likely that there was error, that the testimony did go beyond what was appropriate. But what, how would you tell us that this case is more like Hawkins and less like Emanuel, our 2009 case that's on? Yes, thank you, Judge Grant. I would say this case is much more like Hawkins than Emanuel because this case was all about Agent Lee. This was a seven-day trial. Agent Lee's testimony went on for four, he testified four different days. Four hundred and fifty pages of transcripts were devoted to Agent Lee's interpretation. Sixteen other witnesses testified and in the aggregate, their testimony only covered a hundred and fifty pages. This was a wiretap case and none of the other witnesses testified. I have a question for you and I do appreciate the fact that there was a lot of testimony. There were many days and many pages of transcripts, although I don't think that that's the only measure of the substance and import of testimony. So let me ask you this. Other than Agent Lee's testimony, what did the government offer as evidence against your client, if anything? The government offered in this case against both defendants three cash and drug seizures exclusively related to, they argued, Eddie Lee Perry. First, a Davenport and Washington was stopped in a parked car on May 16, 2013, where crack and powder cocaine was found. There was nothing to connect that crack and powder cocaine to Eddie Lee Perry. Mr. Davenport and Mr. Washington did not implicate him. Second, May 29, 2013, there were telephone calls between Eddie Lee Perry and Darnell Anderson and there was a car wash stop where Mr. Perry came to the car wash and saw Mr. Anderson. The agent said that they saw the two of them but were unable to see anything that transpired because the two were in a utility shed. After Mr. Perry left, they tried to stop Mr. Anderson. They chased him in a car. They lost track of him for some period of time and they say that he threw a shoebox that had crack in it, but when he was stopped, again, he did not implicate Mr. Perry in his conversations about how that crack, what was happening with the shoebox. Finally, I'll say quickly because I have 36 seconds, there was a stop where cash was taken from the co-defendant, Mr. Reagan. The task force, again, was chasing Mr. Reagan. They lost sight of the car. A couple of hours later in a traffic stop when they got Mr. Reagan, he had $18,870. He did not implicate Mr. Perry. So this case is all about wiretaps and the interpretation that really amounted to just a second closing argument of the government. Ms. Holtz, this is Judge Marcus. Let me ask you just sort of one question. Ms. Holtz, can you hear me? This is Judge Marcus. I do. Hello, Judge Marcus. Hi. Just one question. I take it there's no dispute from you that we are reviewing this issue about Lee's testimony under a plain error standard. Is there any dispute about that? I agree that that's the direction that makes most sense in light of Hawkins. I do believe the trial counsel made a justiciable objection that was followed up saying he's an expert in lingo, but this goes beyond the purview of the jury. He's taking away, he's interjecting his thoughts about every single word that goes beyond his expertise. I would object to this. And Ms. McEwen, the Assistant United States Attorney, responded to the objection. And she said this was actually in response to a question concerning what real crazy meant. And Agent Lee was prepared to talk about what it meant. And the government said, well, crazy can mean a lot of things in common parlance, but I'm asking this witness if it has a specific meaning in the drug context. That's what he's testifying to. And the court's response was overruled and to tell the jury, this is an expert. You can give it whatever way to choose. So, yes, I think, but it wasn't a continuing objection. It was very clear. The reason I raise it is because obviously the witness testified for a long time about a whole lot of things. And it seems to me some of the testimony was properly admissible, like when he was giving meaning to terms like Lulu, etc., that would have called for the need for an expert. And there were other things that he said, to my account, that went far beyond what any expert would have said. They were unnecessary, and they really didn't add anything that you couldn't get from the tapes themselves. But I just wanted to know what we're reviewing it for. And it seemed to me that we are reviewing it for plain error, in which case I think the central question here is not whether there was error. I think there was. The question is whether on the plain error review it affected the substantial rights of your client, or put perhaps more artfully, whether independent of the commentary by the witness that went too far, whether there was more than sufficient evidence to sustain the conviction. And on plain error review, the burden clearly rests with you. But I just wanted to make sure that we were in agreement here that this is a plain error review. Yes, I think that that is the wisest course, because that objection was not continuing. I think it was pretty clear, and I think it wasn't badly made, and the timing wasn't off, but I think there had to have been a ruling, should have been a limiting ruling, to allow him a continuing objection. Or he just should have continued to object throughout the whole trial. So yes, Judge Marcus, I agree the burden is on us to show that but for that there could have been no conviction, or likely would have been no conviction. And I believe that my response to Judge Axsom, I think, was to say there really wasn't plain, they didn't have anything else. Had a lot of inferences. Didn't they have, let me just start at the beginning, wasn't the most powerful piece of evidence the extended tapes that were played for the jury, independent of the witness's commentary and explanatory notes? I mean they heard hours of testimony here about your client. Yes. But the fact that the witness was able to provide to the jury, essentially invading their problems, telling them how to consider these pieces of evidence, and then giving the government a second summation, spoon feeding I think was the word you all had used in Hawkins, spoon feeding the case. Such that, while I agree, Judge Marcus, the jury may have on their own have been able to get there. The question is, did this affect the fairness? Do we have confidence in these judicial proceedings when a trial is run this way? Let me ask you the question, let me ask you the question. If you cannot establish that the result would likely have been different, depending on whether the basis of the other testimony, if this wasn't here, it's hard to sustain the fourth prong of plain error review. So you really, it seems to me, you've got to argue that this testimony was so powerful and so colorated the entire trial that you've established that his substantial rights were affected. Am I missing something there? No, I agree with you. I agree, but I think using your language in Hawkins, I don't see how you can separate those two. It's the yolk and the egg. Of course, the difference is what Hawkins did and didn't do. Hawkins never made an examination for plain error under the third prong of the plain error analysis. Hawkins never came to grips with whether the defendant's substantial rights were affected in that sense, did it? I think they're turning to the third plain error element on page 1267, clear and obvious error, that must have affected the outcome of the district court proceedings, such that absent that error, there's a reasonable probability of a different result. No, no, I know that they frame it. I guess what I'm, all I'm saying is the evidence, was the evidence marshaled and is the evidence, the quotient of evidence, independent evidence, independent of the error that's marshaled there, is not necessarily the same quotient of evidence that's marshaled here, independent of the error, is it? Yes, I think it is. I don't see the difference. I think Hawkins had the same issue. You had a ton of phone calls about Hawkins, a ton of wiretaps that obviously the government is saying, you interpret them this way, and this is all drug talk, folks. So when Hawkins Court looks at those tapes, none of the members of the court are saying, hey, this is just a ton of talk. And, you know, maybe 12 calls relating to Mr. Hawkins wouldn't have been enough, but, hey, 100 calls, I think that's just as speculative as the idea of, I think what Judge Axel was saying is looking at page numbers. But that's what the court did in Hawkins. They're saying, look, the only way we can evaluate whether this mattered, whether it was important, is whether this was a substantial part of the government's case. And that's how we look at it. How much time was Agent Lee on the stand telling the jury how to think about this case, just the way the government wants you to think about it? I got it. Thank you very much. Thank you so much. Thank you. Mr. Wright. Yes, Your Honor. If it would please the court, thank you for having us. I represent a co-appellant, Chad Reagan. We are leading, I guess, with what we believe is our strongest argument, and that is the sentencing issue. We believe that the standard of review for that would be the NOVA, as it is the sentencing issue. And in a nutshell, if I can start by first taking the court back to the verdict. The jury convicted my client of count one, the drug conspiracy count, but also made a special finding of less than 500 grams. That sort of puts him in the posture that but for the inclusion at sentencing of what was introduced at trial as relevant conduct, completely extrinsic to the conspiracy, to the actual charged conduct, but for that inclusion, he would be in a substantially much better sentence. We submit about eight points less. It would almost half his sentence. Specifically, he was found to have a sentence of a level 34, which put him at 168 to 210. He was sentenced for 180 months. If you take out the 404B evidence, the evidence that came in for that limited purpose, then he would be at a level 26 because there's both narcotics and there's also a weapon that played in his sentencing. And we would submit to the court that looking to the Maxwell and the progeny of cases that sort of come from the Maxwell decision, we would see that in looking as to whether or not this 404B evidence should constitute relevant conduct, we look at different factors to see if any of the factors apply. Is there a common victim? Is there a common accomplice? Is there a common purpose or modus operandi? And we would respectfully suggest to the court there is not. One, it happens nine months after. Mr. Wright, I'm sorry to interrupt your train of thought and that the clerk will pause the time. I'm having a little bit of trouble hearing you. I'm sorry to say that. I want to make sure we work on it before it gets worse. Yes, Judge. Is this any better? Yes, that's much better. Thank you. All right. Clerk, please start the time again. And I apologize, Your Honor, for my phone system sort of picking up. We're all getting through. This essentially is the issue, and I'll step back just a little bit, where 404B evidence of a drug transaction which occurs nine months after the charged conspiracy has ended. The time frame alleged in the indictment for the conspiracy to end has ended, and that specifically, this conspiracy was from January 2010 to December 2013. Nine months later, in another state, my client, pursuant to a search warrant, is arrested. They find drugs. They find a gun. That is all included in trial, which I understand is a 404B situation. However, notwithstanding that that necessarily meant it was extrinsic, it was not part of the conspiracy, the court then found it as relevant conduct, and that increased him from what would have been a 26 to a 34. We would suggest to the court that there were no common factors. One, it was outside the scope. There weren't common accomplices, common modus operandi. Any of the factors sort of set forth in U.S. v. Maxwell, or most recently, and I apologize for the lateness of my filing, Your Honors, but I did put the Witset decision and a copy of it. It's an unpublished decision, but it also talks about what do we do when we have what would arguably be a 404B other drug case, but it's not part of the charged conduct or charged conspiracy. Should that be put into the sentencing calculations of the court? And we would respectfully say that difference was substantial, and we think it was error to, on one hand, say it is an extrinsic event, not part of this charged conduct or conspiracy, yet we're going to sentence you as if it is, because in essence, is that essentially what relevant conduct really is saying, that you may not be specifically charged for it, but we're going to hold you accountable for that uncharged conduct, because it's still part of a series of transactions, part of things you were doing with these same people in this same time frame, or some of the enumerated factors. So for that reason, judges, we're asking that this case be remanded and Mr. Reagan be resentenced without inclusion of this event, which occurs, again, nine months after the charged conduct. So that is the primary error that we're indicating to the court and asking for a remand. Second, we did raise the issue of whether or not he should have got a minor role reduction. Very briefly, the jury's verdict, and to speak life into it, they found that he was not culpable or liable for large amounts of narcotics. In fact, specifically found less than 500 grams. If the 404B evidence is, in fact, not part of the charged conduct, not only is the gun, not only is the narcotics found in that excluded from sentencing, but it also shouldn't weigh against him in assessing what was his role. His role in this offense, then, is a courier who, by the government's own admission in their case, didn't have enough money to even get home after he does a mule activity. So from our standpoint, we believe that a minor role reduction would have been appropriate with what evidence there was actually in the case. And with that, Your Honor, I'll reserve the remainder of my time for rebuttal. Let me ask you just one question, if I can. Yes, Judge. Was this issue in its totality fairly raised before the district court? If you could put the judge on notice about the totality of the argument you're making here. Your Honor, I believe so. At sentencing, the court was made aware that while there was a breakdown in communication between the trial attorney and Mr. Reagan, Mr. Reagan addressed the court and talked about the fact that he did not believe that the 404B evidence should be used against him as sentencing as relevant conduct. And that was raised at the sentencing hearing. The court summarily overruled any objection that Mr. Reagan was trying to articulate. I'm sorry. The reason that I raised it is I was curious whether you raised with the district court concerning this 404B evidence its application to an enhancement for possessing a dangerous weapon. Was that raised with the judge? Your Honor, again and all candid to the court, I do not see where Mr. Reagan specifically made mention of the weapon. And I know in the government's brief it talks about the weapon, but I would suggest as Mr. Reagan was essentially put in a position where in a layman, almost pro se posture, he's trying to argue that the whole 404B episode, and again, if the 404B episode doesn't come in as relevant conduct, then neither the gun nor the drugs should come in as opposed to trying to parse the two because they both still emanate from the same issue of an extrinsic event. So to answer your question again, Judge, no, he does not specifically say gun. But I think it follows that by raising the issue that the 404B should not have been relevant conduct, I think the government and the record is then on notice that he is talking about both the drugs and the gun. All right. Thank you. Thank you, Your Honor. Ms. Miller for the United States, you've got 15 minutes. Okay. Thank you. Good morning. May it please the court, Angela Miller for the United States. I would like to address, Judge Grant, your question about whether this case falls on the Emanuel side or the Hawkins side. And I think this clearly falls under Emanuel. As Judge Axson mentioned, you know, there's a difference sometimes between quality and quantity. And while there were 100 recorded phone calls played for the jury, the witness did not speak about all of those calls. But there was a considerable amount of evidence available to the jury independent of phone calls or independent of any testimony associated with those phone calls that would be considered problematic under Hawkins that would establish the defendant's guilt. For example, my opponent talked about the arrest of Anderson and the recovery of drugs. What prompted that incident were two phone calls from Anderson to Perry where Anderson said, and this is the gist of the call, bring me two by here. The next day, he said, bring me another. That prompted surveillance of Perry. And Perry was seen going to Anderson's place of business, exiting his car, reaching back into the car, and going into a shed with Anderson and then leaving. Anderson was then arrested shortly thereafter with close to three ounces of crack cocaine. So there's no suggestion that the testimony or the call about bring me two and bring me another is problematic. In addition, the stop of Reagan, again, that was prompted by a phone call. But all that was said in that phone call was Perry to Ross saying, I'm wrapping up that thing. And the jury had heard testimony from the witness clearly in his role as an expert that drug dealers often wrap up money either in shrink wrap or electrical tape or duct tape to keep it small and make sure it doesn't fly around and to hide it. That prompted a call or that prompted a response from Ross that said black boys coming by. And the jury knew that Reagan was black boy because Ross had referred to him as black boy in calls. And then that prompted a surveillance of Perry. They saw Reagan's car outside Perry's home. They followed Reagan's car. Reagan then called Ross and said, I'm being followed and I have a dub. And the jury had heard, again, not problematic testimony that a dub can refer to 20 or 20,000. And when Reagan was stopped, he had close to $20,000 wrapped up in tape. So there was a considerable amount of evidence from the 100 phone calls that are not at all problematic under Hawkins and tied to the seizure of drugs and money. So I really do think this falls under a manual. Particularly it's important for this court to realize, as you do, that it's on plain error review. And, therefore, the burden is on the defendant to show that any error that may have been plain under Hawkins affected his substantial rights. And I simply don't think the defendant can get there given the volume of testimony that, excuse me, the volume of phone calls that came in that were not contested, that were not problematic under Hawkins, and did not have the type of testimony that this court found problematic with a witness summarizing evidence or providing speculation or providing long, unfettered narrative responses that this court found problematic in Hawkins. Ms. Miller, this is Judge Atkins. I have a question for you about, you know, I noted in your brief that you concede that there are some instances of improper testimony by Agent Lee. But you don't identify which testimony would have been proper. And I actually did go over all of the calls and Agent Lee's testimony. And there are a number, I would say the great majority of the calls have testimony, have instances where not only is Agent Lee testifying about things within the scope of his expertise, but he's also drawing all of the inferences that the jury should draw. He's doing it as the judge pointed out in his instruction during the course of Agent Lee's testimony. He's doing this as an expert. So these inferences that he's drawing, he's doing as an expert. Or in the instances where he was speculating, he's doing that as an expert. How does that not bleed over the proper testimony and make all of it incredibly suspect? So I understand your concern. And I think what differentiates this case from Hawkins are two things, are the questions that were asked by the prosecutor and the nature of the responses. And what this court found so problematic in Hawkins, understandably, is that many of the questions were prompted with the phrase, based on your training and expertise and your investigation. So it really was confusing to the jury whether the witness was testifying as an expert or as a factual witness as the lead investigator. And the prosecutor here did a really good job of breaking up the phone calls and the statements in them by asking, is this something you've heard before? Or is this language you hear in drug investigations? And so it's clear he's testifying about code or drug trafficking processes. But then the prosecutor would ask, in the context of this investigation, did you learn? Or the witness would respond, I learned from my investigation. So I do think that differentiates this from Hawkins, where you had so much bleed over, where the jury wouldn't know whether the witness was testifying in his role as an expert or as a factual witness. And so that differentiates it here. And, again, there were about 20 questions where the witness was not ‑‑ I'm sorry, 20 phone calls that were played, excuse me, where the witness was not asked any questions, was only asked to provide the time or the date of the call, or was asked to identify the speakers or, based on the investigation, the name of somebody, a code name of somebody mentioned in the conversation. So there's a great number of calls that didn't have any relevant testimony about ‑‑ Ms. Miller? Yes. I'm sorry. It's breaking up, and it sounds like it's not an issue with your phone. I hope the clerk will pause the time for a moment and see if we can figure this out. I want to make sure that all the counsel can be heard. Was anyone with me having trouble hearing that? I hear you fine, Judge Grant. Were you able to hear Ms. Miller? I have been able to, yes. Okay. Well, then, if I'm the only one having problems, let's carry on. So there is no problem hearing me? I should continue? No, now you sound great. Thank you. Oh, okay. I'm sorry if the technical difficulty was on our end. It's the best the government can buy. Let me ask you, Ms. Miller. Ms. Miller, this is Judge Marcus. Are there any other differences between this case and Hawkins other than the one that you just drew between how the prosecutor conducted the examination of this expert from how he conducted the examination of the expert in Hawkins? I think there are a couple of things, Your Honor. As I said before, the sheer volume of problematic testimony identified in Hawkins, I think, differentiates our case because, again, of the 100 phone calls, you know, about half of them didn't even have anything asked substantively about them, or it was absolutely clear that what was being asked of the witness was to explain one or two drug words or phrases or drug amounts or quantities or pricing, and also the amount of evidence in this case establishing very few. Okay. That's what I want you to zero in on, the quotient of evidence available to the jury here, independent of the commentary that the expert made that went far beyond simply an expert telling the jury what a term like Lulu might have meant. So if I understand your question correctly, Your Honor, calls where the witness is explaining what Lulu meant is okay because there are about half of the calls. I want to know what other evidence beyond the testimony of Perry, independent of the expert, I'm sorry, what is the quotient of evidence independently available to enable the jury to reach this determination? Well, as I pointed out, I think it's quite clear. Again, quality and quantity can be two different things, right? We have the searches, I'm sorry, the surveillance that was set up on Perry after the two calls of bring me two by here and then the next day bring me another one, and that set up the surveillance which showed Perry going to Anderson and again reaching in the car, meeting with him in a shed, and then Anderson being arrested with the equivalent of three ounces of crack cocaine, again, after saying bring me two and bring me another. And as I mentioned before, the $20,000 found in Reagan's car after the simple statement of I'm wrapping up that thing and Ross saying Reagan, black boy, who's Reagan, will be by. And so I know that's not quantity-wise a lot of pages in the transcript, but it's pretty powerful evidence that connects Perry to this drug distribution conspiracy that shows his participation in guilt, and that's why I think in this case it's quite hard for Perry to show that any error that existed given that this court's decision in Hawkins could not have affected his substantial rights because that evidence alone would have been sufficient for him, for the jury to conclude that he participated in the conspiracy. One concern I have in a, frankly, what I think is a pretty close case like this is where we find harmless error, it may encourage the government to just take a risk to kind of lather up the testimony and hope that there's enough else, that if we have a problem with it, we'll be in there to be enough evidence. Why shouldn't that be a concern in a case like this? I apologize, Your Honor, I missed the very first part of your question. Could you repeat it? I apologize. Sure, absolutely. Well, I think we're all dealing with different systems here. What I was asking is, I think in a close case like this, there's a concern, at least I have a concern, that by approving this and finding that ultimately it did not impact his substantial rights, it might encourage the government to push pretty close to the line just to make sure that the jury hears as many kind of damning things about the defendant's conduct as possible, even if that testimony goes beyond what the officer really should be giving. Why shouldn't I be concerned that approving that implicitly in this case as not affecting his substantial rights won't kind of make this more routine as a matter of trial tactics? Well, again, I would argue that this is not a close case, and again, because of the evidence that I just went over, would be more than sufficient for a jury to conclude that Perry was guilty of participating in the conspiracy. And as I mentioned before, the questions that the prosecutor asked, the way that she framed them for the jury, I think gets this out of Hawkins' land, where there really was a risk of confusing the jury if the witness was testifying in his role as an expert or as a factual witness as the lead investigator. And this court's decision in Hawkins, I think, sets out a pretty clear guidance going forward about what the role of the prosecutor should be in cases like this and also the role of the district court. So you set down a marker on how we should proceed going forward. But again, in this case, again, which was tried without the benefit of Hawkins, I still think differs considerably given, again, the type of questions that were asked, the nature of the responses that were given, the amount of relevant evidence that came in through the phone calls, independent of any potential error by the witness's testimony, and then the evidence of his participation in the conspiracy independent of the phone calls. Ms. Miller, can you help me with the argument made by counsel for Mr. Reagan specifically dealing with the relevant conduct and the admissibility of 404B evidence, subsequent similar act evidence, that was similar in kind but wholly unrelated to these charges? Well, Your Honor, I wouldn't say they were wholly unrelated. They did involve the same co-conspirators. So he was, and I would take issue right off the bat with... Two minutes remaining. You may answer my question, please. Thank you. I would take issue first. It wasn't nine months. He was arrested nine months with that quantity of drugs and the guns in his apartment, but he admitted in his statement that he had been doing so for two or three months. So we're looking more at six or seven. So the period, let me just stop you at that. So the period of time from when the charged conspiracy ended and the subsequent similar act occurred was six months, and it involved how many common players? Two, Reagan and Ross. And in an interview that Perry gave post-arrest that was included in the PSR and referenced in the PSR, Perry explained that Reagan was the courier of drugs and money for Ross. So we do have two similar players, Ross and Reagan. We have similar drugs. We have the cocaine. And it's important to note that the judge at sentencing made some findings where she pointed out simply because the indictment has an end date of a conspiracy, actually it's not always the case that a conspiracy ends. And she noted that there was no evidence that Reagan had affirmatively left the conspiracy or that this conspiracy stopped manufacturing and selling drugs. So the end date of the conspiracy in the indictment was based on the end of the expiration of the wiretap of Ross' phone. So I think that's important to know. And so when we do have common accomplices, we do have a short period of time, again, at the most six to seven months, and still large quantities of cocaine in both this relevant conduct and the charged conspiracy. I think we're comfortably in this court's precedent like Simpson, which would allow this to be considered as relevant conduct at sentencing. I take it then for it to be considered, it must at least be sufficiently related to the underlying crime. You agree with that? Yes. I think this court in Gomez has said acts outside of a charged conspiracy may be considered as relevant conduct at sentencing, and if it is sufficiently related. And you look at some things like the similarities. I guess what I'm asking is the wisdom of this sufficiently related. Suppose the subsequent act was uncharged, it was separate and removed in time, involved different players except for the defendant, but was of enormous magnitude in terms of the nature of the crime. Would a sentencing judge be free to consider that? Let me finish. Would he characterize it as relevant conduct or not? I think the sentencing judge has broad discretion to consider lots of conduct to see whether it's relevant. But the description that you just provided, again, I think is closer to what my opposing counsel set forth and Witt set where the only common person was the defendant. And so when you consider the factors that this court has set out that a sentencing court must consider to see whether something is sufficiently related, then you have here, like I said, the same co-conspirators, you have two, the same type of drug in a very short period of time. So I understand your question. It would be a much tougher call. I understand that. That's the question that I'm asking. Given the fact that Congress proposed in the district judge very broad discretion in sentencing and allows them to consider or her to consider just about anything, so long as it's relevant in the sense that it bears upon culpability, danger, deterrence, et cetera, could a trial judge consider conduct not a conviction, just a 404B evidence subsequent act of sufficient severity proven to the satisfaction of the trial court as bearing on it? Would it have to be characterized as relevant conduct to come in? I guess is really what I'm asking. For it to be relevant conduct, there has to be a relationship. That much seems clear to me. But I'm asking about stuff that's wholly unrelated but of enormous gravity. Can the trial court consider it? I'm not sure a trial court could consider it under, you know, 1B1.3 if it is not related. And so that's what the guidelines require a court to look at. What I'm asking, what I'm really asking is, is it admissible, may it be considered if it's proven to the satisfaction of the court, of sufficient gravity as bearing upon the sentence and bearing on the factors, the penological factors that Congress said the sentencing judge must consider, even if it isn't sufficiently related? I understand that's not what we have here, but I'm asking a different question that may illuminate this issue too. I understand, Your Honor, and I'm sorry that I don't have a satisfactory answer for you. Okay. I think if you're just, oh, okay. Yep. That's fine. I just wanted to ask that. I didn't mean to cut you off. No, that's okay. If there's anything else you wanted to add, I'm more than happy to hear it. No, I think I should just stop at this point. Thank you. Thank you. All right. Thank you, Ms. Miller. Ms. Hogue, you are back up for one and a half minutes. Thank you. The issue of whether this is more Hawkins or whether more Emanuel is really answered as well by our allegation of error claim number two in our brief. When you consider the admissibility of the hearsay that was introduced when Dexter Young, an out-of-court declarant, was testifying by the recorded phone call over objection and interpreted by Mr. Young as the truth of the matter he believed Dexter Young was testifying about, like, and this is quotes, that Mr. Young was having problems converting powder cocaine, that Mr. Perry had sold him, and that Mr. Young wanted Mr. Perry to send co-defendant Davenport over to help Young cook the crack cocaine better. What was he interpreting? A phone call in which Mr. Young says he's having problems washing his dog and that he wants Mr. Perry to send over the guy to help wash the dog. Your Honor, the government had plenty of benefit, didn't need Hawkins. They had Emanuel. They had Emanuel, just as Hawkins says, that it is so dangerous, may I conclude? You may. It's so dangerous to leave plain error uncorrected. It would be suggesting to prosecutors in the circuit that overzealous presentation of improper testimony would be tolerated, and it would be giving a message to the district courts that they need not be ignoring the integrity of trials involving this type of testimony. We respectfully ask that this case be reversed. Thank you. Mr. Wright. Yes, Your Honor. One, if I could circle back, I wanted to just point to the record where I think the objection was preserved. Looking to page 8, lines 9 through 14 of the sentencing transcript is where the relevant conduct comes up. At page 9, lines 14 through 21, we're specifically talking about, again, disrelevant conduct. And at page 12, lines 24 through 25, the court says, well, to the extent that it's not a formal objection, but to the degree that it is, the court overrules it. I would then ask the court to consider in volume 5, page 39 and 40, the being 404B and not intrinsic to this conspiracy is being had at page 39, lines 23 through 25. And what's actually said is that my client's statement is that I've been keeping cocaine and heroin for Roger Ross for about two or three months, as in he just had received it, which is, again, six months after this conspiracy had ended. And Ross is not part of this trial. So that's why the government put it forth as 404B evidence. But then at sentencing, all of a sudden it becomes the mammoth gun and far more drugs to increase his sentencing, even though, again, there was never a showing that this had anything to do with the charged conduct or connected. Thank you, Your Honors. Thank you, Mr. Wright. Thank you to all of our counsel. And Ms. Hogue, I believe that you were appointed by this court to represent Mr. Perry. I'll assume that's a yes. Yes, that's correct. Thank you for your service to the court in helping us better understand Mr. Perry's arguments. And, again, thank all of you for your helpful comments today. Thank you so much. That means a great deal to me. Wonderful. I appreciate that.